IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RONALD L. W,[1] | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 18-cv-620-CJP[2] |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
|       Defendant. | ) |

## **MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## **Procedural History**

Plaintiff applied for benefits in February 2014, alleging he became disabled as of September 29, 2012. After holding an evidentiary hearing, ALJ Stuart T. Janney denied the application on March 17, 2017. (Tr. 28-41). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 2). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 18.

## Issue Raised by Plaintiff

Plaintiff raises the following issues:

1. The ALJ erred in weighing the medical opinions.

2. The ALJ's physical RFC assessment did not comport with SSR 96-8p in that the ALJ himself interpreted the record and did not adequately explain the bases for his findings.

3. The ALJ did not appropriately evaluate plaintiff's mental impairments.

4. The ALJ did not assess plaintiff's subjective allegations in line with SSR 16-3p.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. The standard for disability under both sets of statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step

3

three. If the claimant does not have a listed impairment at step three and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve

4

conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Murphy v. Colvin,* 759 F.3d 811, 815 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### **The Decision of the ALJ**

ALJ Janney followed the five-step analytical framework described above. He determined that plaintiff had not been engaged in substantial gainful activity since the alleged onset date and that he had severe impairments of Tourette's syndrome and lumbar spine degenerative disc disease with stenosis, which did not meet or equal a listed impairment. He found that plaintiff's mental impairments were nonsevere because they caused only mild limitations.

The ALJ found that plaintiff had the residual functional capacity to perform light work limited to no climbing of ladders, ropes or scaffolds; and no exposure to common workplace hazards such as exposed moving machinery, operation of commercial motor vehicle equipment, and unprotected heights.

Based on the testimony of a vocational expert, the ALJ found that plaintiff could not do his past relevant work, but he was not disabled because he was able to do other jobs that exist in significant numbers in the national economy.

### **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record focuses on the points raised by plaintiff.

### 1. Agency Forms

Plaintiff was born in 1966 and was 46 years on the alleged date of disability. (Tr. 350). A prior claim had been denied as of September 28, 2012. (Tr. 351). He had completed the 11th grade and had worked as a cook in a fast food restaurant, a laborer, and a personal assistant in an independent living facility. (Tr. 356).

In a Function Report submitted in May 2014, plaintiff said he had many "spells" during the day and night during which he fell, hit things, and sometimes cut himself. He described these as jerking spells. He lived with his aunt. He spent his time watching tv and occasionally fishing. (Tr. 362-369).

Two friends and plaintiff's aunt completed Seizure Questionnaires stating that plaintiff had numerous "seizures" during which he did not lose consciousness. He jerked and twitched. (Tr. 378-381).

In March 2015, plaintiff reported that he "jerked a lot" and had Tourette's. His medications made him feel like he was in slow motion and his concentration was very poor. (Tr. 391).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing in December 2016. The ALJ noted that counsel's pre-hearing brief (Tr. 429) amended the alleged onset date to May 7, 2014. (Tr. 51-52). The ALJ did not refer to the amendment in his written decision.

Plaintiff had lost about 40 pounds because he was taking Clonazepam. His medication had been changed about 2 weeks earlier. (Tr. 55). Before

Clonazepam, he took Haldol which caused memory loss and confusion. He still had some confusion and memory loss at the time of the hearing. (Tr. 69).

Plaintiff tried to start a lawn care business with a friend, but he could not do the work. He jerked so hard that he fell off a lawnmower. Pushing a lawnmower caused him pain in his back. (Tr. 56-57).

Plaintiff testified that he had more than 100 "spells" from Tourette's Syndrome each day. They continued through the night and woke him up. He jerked; sometimes just his arm jerked and other times his whole body jerked. He sometimes verbalized words during a spell, but he tried not to. He had this condition for over 30 years, but it was getting worse as he got older. He sometimes injured himself during a spell. (Tr. 63-64). He also had deteriorating discs in his neck and low back. He was taking hydrocodone for low back pain. (Tr. 65).

A vocational expert (VE) also testified. The ALJ asked her a hypothetical question which corresponded to the RFC assessment. The VE testified that this person could not do plaintiff's past work, but he could do other jobs that exist in the national economy. (Tr. 72-76). She also testified that, if plaintiff's 'tics' throughout the day caused him to be off-task for 15% of the workday, there would be no unskilled occupations that he could perform. (Tr.775).

### 3. Relevant Medical Records

Dr. Robert Gardner, a neurologist, first saw plaintiff in May 2014. Plaintiff had a history of involuntary jerking movements sometimes accompanied by verbalization of curse words. During the exam, plaintiff had "frequent paroxysmal rather violent tic-like movements of his arms and body." Dr. Gardner suspected

7

Tourette's Syndrome. (Tr. 474-476). In June 2014, Dr. Gardner prescribed Clonazepam. (Tr. 495). Because of side effects, his medication was switched to Haldol. (Tr. 578-579). The dosage of Haldol was increased in October 2014. (Tr. 576-577). In November 2014, Dr. Gardner noted a marked reduction in jerking movements and he no longer had episodes of bad language. (Tr. 574-575). In February 2015, plaintiff's Tourette's was in "fairly good control" on Haldol with no side effects. (Tr. 572-573).

Plaintiff's primary care physician was Nicole Kennedy, M. D. She saw him for follow-up on left-sided back pain in June 2014. He had been prescribed Diclofenac at an earlier visit, which was helping his back pain. His neurologist was evaluating him for Tourette's. (Tr. 532-534).

In June 2014, Adrian Feinerman, M.D., performed a consultative physical exam. (Tr. 504-518). Plaintiff was 5'10" tall and weighed 162 pounds. He had a full range of motion of all joints and of the spine. He had no muscle spasm or atrophy, and muscle strength was normal throughout. Fine and gross manipulation were normal. Ambulation was normal. Straight leg raising was negative. Plaintiff did exhibit "violent jerks involving his entire body which occurred every few minutes (less when involved in conversation) and lasted less than 1 second." (Tr. 509).

In December 2014, plaintiff told Dr. Kennedy that Dr. Gardner had prescribed Haldol for his Tourette's and this was controlling most of his involuntary movements. His back pain was doing well, but he was having daily headaches. (Tr. 528-531).

The next record from Dr. Kennedy is from June 2016. Plaintiff was trying to start a lawncare business and had been doing some heavy work. He had increased back pain on both sides. The pain did not radiate. Physical exam was normal except for tenderness to palpation over the bilateral SI joints. Dr. Kennedy prescribed Tramadol and Prednisone, as well as a lumbar MRI. (Tr. 628-631).

The MRI findings included a small broad-based disc bulge and moderate facet arthropathy at L4-L5; severe degenerative endplate change and near-complete disc height loss at L5-S1; and "a small broad-based disc/osteophyte complex with a right neuroforaminal and lateral disc protrusion/disc complex resulting in abutment or impingement of the exiting right nerve root. There is no significant central canal stenosis. There is moderate posterior facet arthropathy contributing to mild to moderate left neural foraminal narrowing and mild abutment of the left exiting L5 nerve root." Under the section entitled "Impression," the report says that there is "moderate to severe central canal stenosis with moderate posterior facet arthropathy resulting in abutment of the left and abutment/impingement of the right exiting L5 nerve roots." (Tr. 632-633).

Plaintiff returned to Dr. Kennedy in August 2016. He said he had been evaluated by a Dr. Scott, who recommended injections but not surgery.[4] Plaintiff did not want injections because of his Tourette's. He elected to continue taking Tramadol, which was helping with the pain. Again, the only positive finding on exam was tenderness to palpation over the bilateral SI joints. (626-628).

In May 2016, plaintiff told Dr. Gardner he was having episodes of "loss of

---

[4] There are no records from Dr. Scott in the transcript.

contact." In one episode, he had torn up the bathroom walls but did not remember doing it. He was lost and disoriented at times. He was again taking Clonazepam.[5] Dr. Gardner did not appreciate any "adventitious movements" on exam. He ordered a brain MRI and an EEG. (Tr. 646-647). The MRI showed some nonspecific white matter changes. In August 2016, Dr. Gardner again prescribed Clonazepam, although plaintiff complained of weight loss. (Tr. 648). The ambulatory EEG was normal. (Tr. 643-644).

   **4.   Medical Opinions**

In July 2014, a state agency consultant assessed plaintiff's physical RFC based on a review of the record. He determined that plaintiff was capable of doing work at all exertional levels, limited to no climbing of ladders, ropes, or scaffolds and not even moderate exposure to hazards such as machinery and heights. (Tr. 142-143). In March 2015, a second state agency consultant reviewed the record and agreed. (Tr. 155-157).

In December 2016, treating physician Nicole Kennedy, M.D., assessed plaintiff's physical RFC. (Tr. 663-667). She said she started treating plaintiff in April 2014, and his diagnoses are lumbar disc disease, Tourette's Syndrome, migraines, and spinal stenosis. The clinical findings and objective signs were involuntary movements, and disc protrusion and osteophyte complex at L4-5 and L5-S1 on MRI causing severe central canal stenosis. She said that his low back pain was worsening. In her opinion, he was able to sit for a total of 2 hours a day

---

[5] It is unclear when plaintiff was put back on Clonazepam. There are no office notes from Dr. Gardner between February 2015 and May 2016.

and was able to stand/walk for a total of less than 2 hours a day. The most weight he could lift was 10 pounds, and he could do that only occasionally. He was likely to miss more than 4 days of work per month and would require extra breaks.

   5.   **Records Not Before the ALJ**

The transcript contains medical records that that post-date the ALJ's decision. (Tr. 9-21). Plaintiff submitted the additional records to the Appeals Council, which noted that the records do not relate to the period at issue. (Tr. 3).

Plaintiff cites to these records in his brief. See, Doc. 19, p. 3. However, the medical records at Tr. 9-21 cannot be considered by this Court in determining whether the ALJ's decision was supported by substantial evidence. Records "submitted for the first time to the Appeals Council, though technically a part of the administrative record, cannot be used as a basis for a finding of reversible error." *Luna v. Shalala*, 22 F3d 687, 689 (7th Cir. 1994). See also, *Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 366, n. 2 (7th Cir. 2004).

## Analysis

Plaintiff's first two points are related. He argues that the ALJ erred in giving more weight to the opinions of the state agency consultants and discounting Dr. Kennedy's opinion. Related to this argument is his second point, that the ALJ interpreted the medical evidence himself, including the June 2016 lumbar MRI.

Dr. Kennedy was, of course, a treating physician, referred to in the regulations as a "treating source." Obviously, the ALJ was not required to credit her opinion because of her status; "while the treating physician's opinion is

important, it is not the final word on a claimant's disability." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)(internal citation omitted). A treating source's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

Plaintiff's application was filed before March 27, 2017. The applicable regulation, 20 C.F.R. § 404.1527(c)(2), provides, in part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

If the ALJ decides not to give the opinion controlling weight, he is to weigh it applying the factors set forth in § 404.1527(c)(1)-(6). Supportability and consistency are two important factors to be considered in weighing medical opinions. In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010).

12

Here, the ALJ gave "little weight" to Dr. Kennedy's opinion. He recognized that she was a treating source, but she was not a specialist. He stated that her opinion "is not consistent with the objective record evidence" and pointed out that the "only positive examination finding was some tenderness." He noted that plaintiff never went to the emergency room for "acute conditions, indicating he would not require extra breaks or have excessive absenteeism." He also concluded that the "significant stenosis warrants some limitations, as set forth in the residual functional capacity. However, the extreme limitations Dr. Kennedy assessed are not supported." (Tr. 37).

The ALJ gave "great weight" to the opinions of the state agency consultants regarding plaintiff's nonexertional limitations but concluded that he was limited to light work and was not able to do work at all exertional levels as those consultants found. (Tr. 38).

Plaintiff argues that § 404.1527(c)(2) requires the ALJ to give good reasons for his decision to give less than controlling weight to the opinion of a treating physician. He refers to medical records reflecting treatment after the date of the ALJ's decision, but, again, the Court cannot consider those records. Doc. 19, p. 7.

Plaintiff argues that the ALJ impermissibly made his own independent medical conclusions in two respects. He concluded that a lack of emergency room treatment meant that plaintiff would not be likely to need extra breaks or miss work, and he interpreted the results of the lumbar MRI himself.

The Commissioner argues generally in her brief that the ALJ's RFC assessment was supported by the evidence. She refutes the emergency room point

by saying that "The ALJ did not state that Plaintiff's impairments should have necessitated emergency-room visits. Instead, the ALJ reasonably noted the lack of support for Dr. Kennedy's opinion that Plaintiff's symptoms required extra breaks and excessive absences." Doc. 25, p. 9. She argues, ineffectively, that the ALJ did not improperly characterize the objective test results, but, rather, "discussed them." Doc. 25, pp. 10-11.

The Court agrees that the ALJ erred in weighing the medical opinions.

First, the ALJ impermissibly "played doctor" in concluding that the lack of ER visits cast doubt on Dr. Kennedy's opinion. There is no medical evidence in the file to support the conclusion that lack of ER visits indicates that the claimant would not need extra breaks or miss work, and the ALJ erred by drawing that conclusion himself. *Voigt v. Colvin*, 781 F.3d 871, 877 (7th Cir. 2015); *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015), and cases cited therein.

More significantly, the ALJ reached his own conclusions about the significance of the lumbar MRI findings. Dr. Kennedy reviewed those findings; the state agency consultants obviously did not.

The ALJ discounted Dr. Kennedy's opinion because it was "not consistent with the objective record evidence." However, the ALJ was not competent to decide that the lumbar MRI results were not consistent with the doctor's opinion. "ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves." *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018).

In addition, it was error for the ALJ to credit the state agency consultants'

opinions as to plaintiff's nonexertional limitations when they had no opportunity to review the lumbar MRI. In *Stage v. Colvin*, 812 F.3d 1121 (7th Cir. 2016), the Seventh Circuit held that the ALJ erred in accepting a reviewing doctor's opinion where the reviewer did not have access to later medical evidence containing "significant, new, and potentially decisive findings" that could "reasonably change the reviewing physician's opinion." *Stage*, 812 F.3d at 1125. In a later case, the Seventh Circuit reiterated the rule. "An ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), as amended on reh'g (Apr. 13, 2018). See also, *Lambert*, 896 F.3d at 776.

In view of the disposition of plaintiff's first two points, it is not necessary to analyze his other arguments. On remand, the ALJ should consider the correct Listing for Tourette's Syndrome, 12.11, and properly assess plaintiff's subjective allegation in accordance with SSR 16-3p.

An ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), internal citations omitted. The Court must conclude that ALJ Janney failed to build the requisite logical bridge here. Remand is required where, as here, the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

The Court wishes to stress that this Memorandum and Order should not be

construed as an indication that the Court believes that plaintiff was disabled during the relevant period, or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

### Conclusion

The Commissioner's final decision denying plaintiff's application for disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE: January 17, 2019.**

<u>s/ Clifford J. Proud</u>
**CLIFFORD J. PROUD**
**U.S. MAGISTRATE JUDGE**